UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                       )
MARION LANDERS and MARION  A. DIXON,   )
on behalf of themselves and all others )
similarly situated,                    )
                                       )
            Plaintiffs,                )
                                       )
                                       )      No. 3:04CV1988(JCH)
            vs.                        )
                                       )
                                       )
TOMMY THOMPSON, Secretary of the       )
Department of Health and Human Services, )
                                       )
            Defendant.                 )
_____)


MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
COUNSEL

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.     LEGAL AND FACTUAL BACKGROUND OF THE ISSUE.. . . . . . . . . . . . . . . . . . . . .2

        A.      Medicare coverage of SNF care.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      The named plaintiffs were denied SNF coverage despite
                having spent at least three days in the hospital prior to
                their nursing home stay.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

III.    AS THE NAMED PLAINTIFFS SATISFY THE REQUIREMENTS
        OF RULE 23(a) AND RULE 23(b)(2), THE CLASS SHOULD BE CERTIFIED. . . . . . 6

        A.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

        B.      Plaintiffs meet the requirements of Rule 23(a).. . . . . . . . . . . . . . . . . . . . . . . . . .7

                1.      "Impracticability": the size of the class and
                        other factors demonstrate that joinder is impracticable. . . . . . . . . . . . . . .7

                2.      Rule 23(a)(2) and (3): Common questions of law
                        and fact  exist, and the claims of the named plaintiffs
                        are typical of the claims of the class members . . . . . . . . . . . . . . . . . . . . .12

                3.      Rule 23(a)(4): The named plaintiffs will protect
                        the interests of the class. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

        C.      Plaintiffs meet the requirements of Rule 23(b)(2). . . . . . . . . . . . . . . . . . . . . . .15

IV.     PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS
        CLASS COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

# TABLE OF AUTHORITIES

## Cases

*Ali v. Ashcroft,*
213 F.R.D. 390 (W.D.Wash.), aff'd, 346 F.3d 873 (9th Cir. 2003) ........................................ 12

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997) ........................................................................................ 7, 12, 14, 16

*Anderson v. Dept. of Public Welfare,*
1 F.Supp.2d 456 (E.D.Pa. 1998) .................................................................................... 7

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .................................................................................................... 6, 16

*Comer v. Cisneros,*
37 F.3d 775 (2d Cir. 1994) ...................................................................................... 7, 13, 16

*Conn. State Dept. of Social Services v. Shalala,*
2000 WL 436616 (D.Conn. 2000) .................................................................................. 6

*Conn. State Dept. of Social Services v. Thompson,*
242 F.Supp.2d 127 (D.Conn. 2002), appeal pending, No. 03-6052 (2d Cir.)......................... 14

*Conn. State Dept. of Social Services v. Thompson,*
289 F.Supp.2d 198 (D.Conn. 2003), appeal pending, No. 04-0172 (2d Cir.)..................... 14, 15

*Consol. Rail Corp v. Town of Hyde Park,*
47 F.3d 473 (2d Cir. 1995) ........................................................................................... 8

*Doe v. Bridgeport Police Dept.,*
198 F.R.D. 325 (D.Conn. 2001) .............................................................................. 7, 8, 14, 15

*Fox v. Bowen,*
656 F.Supp. 1236 (D.Conn. 1987) ................................................................................ 7, 15

*General Telephone Co. of Southwest v. Falcon,*
457 U.S. 147 (1982) ................................................................................................... 6

*Gratz v. Bollinger,*
123 S.Ct. 2411 (2003) ................................................................................................. 6

*Gray Panthers Project Fund v. Thompson*,
   273 F.Supp.2d 32 (D.D.C. 2002) ............................................................... 14

*Grijalva v. Shalala*,
   946 F.Supp. 747 (D.Ariz. 1996), aff'd, 152 F.3d 1115 (9th Cir. 1998),
   vacateds, 526 U.S. 1096 (1999) ................................................................ 15

*Healey v. Shalala*,
   No. 3:98CV00418 (DJS) (D.Conn., Nov. 19, 1998) ................................... 7

*Healey v. Thompson*,
   186 F.Supp.2d 105 (D.Conn. 2001), aff'd in part, vacated
   and remanded in part *sub nom. Lutwin v. Thompson*, 361 F.3d 146 (2d Cir. 2004) ................ 15

*In Re Drexel Burnham Lambert Group, Inc.*,
   960 F.2d 285 (2d Cir. 1992) ................................................................. 7, 14

*Jordan v. County of Los Angeles*,
   669 F.2d 1311 (9th Cir.), vacated, 459 U.S. 810 (1982) .................... 11, 12

*Lopez v. Orlor, Inc.*,
   176 F.R.D. 35 (D.Conn. 1997) .................................................................. 7

*Lutwin v. Thompson*,
   361 F.3d 146 (2d Cir. 2004) ....................................................................... 7

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997) ............................................................. *passim*

*National Ass'n of Radiation Survivors v. Walters*,
   111 F.R.D. 595 (N.D.Cal. 1986) ............................................................... 8

*Petrolito v. Arrow Financial Services, LLC*,
   221 F.R.D. 303 (D.Conn. 2004) ........................................................... 8, 13

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993) ................................................... 8, 11, 13, 14

*Shelter Realty Corp. v. Allied Maintenance Corp.*,
   574 F.2d 656 (2d Cir. 1978) ..................................................................... 7

*Smith v. Babcock*,
   748 F.Supp. 501 (E.D.Mich. 1990), vacated, 951 F.2d 350 (6th Cir. 1991) .......................... 12

*U.S. Parole Commission v. Geraghty*,
445 U.S. 388 (1980) ........................................................................................... 6

*Vorster v. Bowen*,
709 F.Supp. 934 (C.D.Cal. 1989) .................................................................... 15

*Westman v. Textron, Inc.*,
151 F.R.D. 229 (D.Conn. 1993) ........................................................................ 7

*Wilson-Coker v. Shalala*,
2001 WL 930770 (D.Conn. 2001) .................................................................... 6

**Statutes**

42 U.S.C.
§ 1395 *et seq.*, ................................................................................................. 2
§ 1395d(a)(1). .................................................................................................. 2
§ 1395d(a)(2) ................................................................................................... 2
§ 1395k(a). ....................................................................................................... 2
§ 1395x(i) ......................................................................................................... 2

**Regulations**

42 C.F.R.
§ 409.30 *et seq.* .............................................................................................. 2
§ 409.30(a). ...................................................................................................... 2

**Rules**

Federal Rules of Civil Procedure,
Rule 23 .............................................................................................................. 7
Rule 23(a) ............................................................................................... 7, 15, 18
Rule 23(a)(1) .......................................................................................... 11, 12
Rule 23(a)(2) ......................................................................................... 12
Rule 23(a)(3) ......................................................................................... 12
Rule 23(a)(4) .................................................................................... 14, 17
Rule 23(b) ........................................................................................................ 7
Rule 23(b)(1) ................................................................................................. 16
Rule 23(b)(2) ......................................................................................... 15, 16, 18
Rule 23(b)(3) ................................................................................................. 16
Rule 23(g) ...................................................................................................... 16

Rule 23(g)(1)(A). ................................................................................................ 16
Rule 23(g)(1)(B) ............................................................................................. 16, 17
Rule 23(g)(1)(C) ......................................................................................... 16, 17, 18
Rule 23(g)(1)(C)(i). ............................................................................................. 17
Rule 23(g)(1)(C)(ii). ............................................................................................ 17
Rule 23(g)(2)(B) .................................................................................................. 16
Rule 23(g)(2)(C) ................................................................................................. 17

**Miscellaneous**

Alba Conte and Herbert B. Newberg,
  *Newberg on Class Actions* (4th ed. 2002) .............................................. 8

DHHS OIG, *Illinois Skilled Nursing Facility Claims Lacking a
  Preceding 3-Day Inpatient Hospital Stay*, No. A-05-99-00018 (Sept. 2000) ....................... 8, 9

DHHS OIG, *Ineligible Medicare Payments to Skilled Nursing Facilities
  under the Administrative Responsibility of Blue Cross and Blue Shield
  of Nebraska*, No. A-05-04-00061 (Dec. 2004) ....................................................... 10

DHHS OIG, *Ineligible Medicare Payments to Skilled Nursing
  Facilities under the Administrative Responsibility of Medicare
  Northwest*, No. A-05-03-00063 (Oct. 2003) .......................................................... 9

Medicare Claims Processing Manual (CMS Pub. 100-4) ............................................... 2, 3

Wright, Miller & Kane, *Federal Practice and Procedure* (2d ed. 1986) .............................. 7

## I.    INTRODUCTION

This action was filed on November 23, 2004 by two Medicare beneficiaries, each of whom was brought to a hospital emergency room, was formally admitted after a day or two, and then was discharged to a skilled nursing facility (SNF or nursing home) after spending three or more days in the hospital.  When they sought Medicare coverage for their nursing home stay, coverage was denied on the ground that they had not met the three-day qualifying hospital stay. In particular, the defendant Secretary declined to treat the time spent in the emergency room, or on observation status, as counting towards the three-day qualifying hospital stay, which had the effect of depriving them of coverage for their stay in the nursing home.

Believing that this policy violates the Medicare statute and the guarantees of equal protection, plaintiffs Marion Landers and Marion Dixon brought this action to obtain declaratory and injunctive relief against the Secretary's policy.  Because that policy is applicable to hospitalized Medicare beneficiaries around the country, they seek to represent a nationwide class of Medicare beneficiaries who have been or will be denied Medicare coverage of their post-hospitalization stay in a nursing home.  Specifically, they seek to represent a class defined as:

All Medicare beneficiaries who (1) have been or will be in a hospital for at least three consecutive days prior to discharge from the hospital; (2) were or will be in the emergency room and/or in observation status for some portion of those days in the hospital; (3) were or will be admitted formally as an inpatient for at least one of those days; (4) after a claim has been or will be filed on their behalf, have been or will be denied Medicare coverage for skilled nursing facility care because of spending less than three days as a formally admitted inpatient; and (5) have or will have a claim pending for

the Medicare coverage so denied at some level of the administrative process, or have

filed or could timely file for review at either the next level of the administrative process

or in federal district court, within sixty (60) days prior to the date of the filing of this

complaint.[1]

**II.      LEGAL AND FACTUAL BACKGROUND OF THE ISSUE.**

      **A.      <u>Medicare coverage of SNF care.</u>**

Medicare, which is Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*.,

establishes entitlement under Part A for coverage in a hospital, including for "inpatient hospital

services."  42 U.S.C. § 1395d(a)(1).  Part A coverage is also available for stay in a skilled

nursing facility subsequent to the patient's discharge from the hospital.  See 42 U.S.C. §§

1395d(a)(2), 1395x(i); 42 C.F.R. § 409.30 *et seq*.  To be eligible for SNF coverage, the

beneficiary must have been in the hospital for at least three consecutive calendar days prior to

her discharge from the hospital.  See 42 U.S.C. § 1395x(i); 42 C.F.R. § 409.30(a).

Part B of Medicare covers services, such as for physicians and laboratory, provided when

the beneficiary is an outpatient.  See 42 U.S.C. § 1395k(a).  Among those services considered

outpatient are "observation services," which are "those services furnished by a hospital on the

hospital's premises, including use of a bed and *at least* periodic monitoring by a hospital's

nursing or other staff ….  Such services are covered only when provided by the order of a

physician or another [authorized] individual …."  Medicare Claims Processing Manual, ch. 4, §

---

[1] The first three numbered parts of the class definition provide the substantive basis for membership in the class: at least three days in a hospital, including some time in the emergency room and/or some time in observation status, with less than three days designated in formal admission status.  The other two numbered parts define the class to include only those who have presented their claim to the Secretary for coverage and whose claim was "alive" in the administrative process at the time of the filing of the complaint.

290.1 (CMS Pub. 100-4).

The Secretary does not count time spent in either the emergency room or in receiving observation services towards the three days needed for a qualifying stay for subsequent SNF coverage.  On the other hand, "[w]hen a beneficiary receives outpatient hospital services during the day immediately preceding the hospital admission, the outpatient hospital services are treated as inpatient services if the beneficiary has Part A coverage."  *Id*., ch. 3, § 40.3.A.  Furthermore, "[d]iagnostic services … provided to a beneficiary by the admitting hospital … within 3 days prior to the date of the beneficiary's admission are deemed to be inpatient services and included in the inpatient payment, unless there is no Part A coverage."  *Id.*, § 40.3.B.

**B.      The named plaintiffs were denied SNF coverage despite having spent at least three days in the hospital prior to their nursing home stay.**

The two named plaintiffs typify how this system works.  On April 20, 2001, then 96-year-old Marion Landers, with a history of osteoporosis, hypothyroidism, urinary retention, vertebral compression fracture, and depression, was taken to a local hospital emergency room with complaints of back pain, inability to stand, and pain in her left leg and hip.  She was administered intravenous (IV) and subcutaneous morphine for severe pain.  The next day, still in the emergency room, she received a CAT scan, which was negative, but an MRI showed L5 vertebral compression fracture.  While in observation status in the emergency room, a physical therapy evaluation was ordered.

On that second day in the hospital, April 21, she was formally admitted as an inpatient. She continued to receive the IV morphine and had an orthopedic consultation.  Her physician recommended a course of IV steroids followed by oral steroids.  Two days later, on April 23, she was discharged and transferred to a nearby SNF.  Except for the deductible her entire stay in the hospital was paid for by Medicare.

Ms. Landers stayed at the SNF until June 4, 2001.  After her claim for Medicare coverage of the SNF care was timely filed, she received an adverse initial determination denying the coverage, which was followed in turn, as she timely proceeded up the administrative ladder, by denials on reconsideration, by the administrative law judge (ALJ), and finally by the Medicare Appeals Council.  The failure to have three consecutive days as a formal inpatient was the sole basis of the decision.

The administrative process consumed over three years, as the initial determination denying coverage was issued on June 15, 2001 and the final step came with the Medicare Appeals Council's decision of September 27, 2004.  As a consequence of the coverage denial, Ms. Landers was billed $11,610 for her approximately 6-week stay in the SNF, which she paid. In effect, because the first day of her hospital stay was spent in the emergency room and on observation status, she was financially responsible for a significant subsequent stay in a nursing home – despite the fact that the care in the emergency room and on observation status was substantially the same as the care that she received after she was formally admitted.

On December 21, 2003, Marion Dixon, who was then 75 years old, was taken to a hospital emergency room after a sudden onset of nausea, vomiting, and lightheadedness.  In the emergency room, he received IV fluids, Zofran, and Ativan, had blood work done, and had a CAT scan of his head, which was negative.  He continued to vomit.  The next day, he was transferred to a bed in the hospital but was considered on observation status.  He was given medications and a continuation of IV fluids, and was put on meclizine.

On the following day, December 23, his status was changed to "full admission," but the records do not indicate that he was moved to a different room or different bed.  A chest X-ray showed that he had pneumonia, for which IV Levaquin was started.  The IV fluids were continued, and blood cultures were done.  On December 24 he was transferred to a SNF, with his

4

hospital discharge diagnoses listed as severe vertigo and nausea, anemia, and right lower lobe pneumonia.

The care and services that Mr. Dixon received after being granted "full admission" status were substantially the same as what he had received while in the emergency room and on observation status.  Again, except for the deductible his entire hospital stay was covered by Medicare.

Mr. Dixon was in the nursing home from December 24, 2003 until January 27, 2004. The SNF submitted two claims to Medicare for the care provided, one for the December 24-31, 2003 period and the second for the January 1-27, 2004 period.  For the first period, the initial determination and a timely filed request for reconsideration resulted in denial because he had not had three days in formal admission status in the hospital.  He sent in a timely request for ALJ review on or about November 22, 2004, but, because of the considerable time that the administrative process consumes, the inevitability of an adverse decision, and the fact that he has already had to pay the cost of SNF care, he also joined in this lawsuit in the hope of obtaining a favorable judicial resolution.

The claim for the second period at issue in the nursing home was also denied at the initial determination stage, and then at reconsideration on December 20, 2004, with a request for ALJ review filed on December 30, 2004.

The cost of his 5-week stay in the SNF, $11,050, was billed to him, and he paid it.  As with Ms. Landers, Mr. Dixon was financially responsible for his post-hospitalization nursing home care solely because his 3-day stay in the hospital included time in the emergency room and on observation status.  The nature of the care received was essentially the same regardless of where it was provided or what his status was deemed to be.

III.   **AS THE NAMED PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(a) AND RULE 23(b)(2), THE CLASS SHOULD BE CERTIFIED.**

A.   <u>**Introduction**</u>

This case is perfectly suited for class certification.  Class actions are a significant and effective tool in the litigation process, for both courts and litigants, as they advance "the efficiency and economy of litigation which is a principal purpose of the procedure." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 159 (1982); see also, *e.g., U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 402-403 (1980).  Furthermore, in cases seeking to correct the improper administration of government benefit programs, they are particularly useful in securing effective relief to everyone harmed by the challenged practice.  In another Social Security Act case, the Supreme Court noted twenty-five years ago that

> class relief for claims such as those presented ... in this case is peculiarly appropriate.  The issues involved are common to the class as a whole.  They turn on questions of law applicable in the same manner to each member of the class ....  It is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue.  And the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every social security beneficiary to be litigated in an economical fashion under Rule 23.

*Califano v. Yamasaki*, 442 U.S. 682, 701 (1979).  Writing for the Court, Chief Justice Rehnquist recently repeated and approved the *Yamasaki* language:  "[A]s the litigation history of this case demonstrates, 'the class-action device save[d] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion.'"  *Gratz v. Bollinger*, 123 S.Ct. 2411, 2426 n.17 (2003).  Accordingly, judges in this district have not hesitated to employ the class certification device in Medicare cases that seek relief for large numbers of beneficiaries.[2]

_____

[2] See, *e.g., Wilson-Coker v. Shalala*, 2001 WL 930770 (D.Conn. 2001) (statewide class certified in case involving Medicare beneficiaries who are also eligible for Medicaid); *Conn. State Dept. of Social Services v. Shalala*, 2000 WL 436616 (D.Conn. 2000) (statewide class

6

Accepting the allegations in the complaint as true,[3] and recognizing that "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility," *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (quotation marks and citation omitted), the Court should therefore certify this case to proceed as a class action.

### B.    Plaintiffs meet the requirements of Rule 23(a).

The party seeking certification must satisfy "the four threshold requirements" set out in Rule 23(a) and also must demonstrate that the action is maintainable under one of the three subdivisions of Rule 23(b).  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997); see also, *e.g., Comer v. Cisneros*, 37 F.3d 775, 796 (2d Cir. 1994).  In this case, as in similar challenges to the Secretary's policies in Social Security Act benefit programs, the propriety of certification is easily demonstrated.

### 1.    "Impracticability": the size of the class and other factors

The first factor for consideration is the impracticability of joinder.  See, *e.g., Comer*, 37 F.3d  at 796; *In Re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir. 1992).  Although this is frequently referred to as the "numerosity requirement," it is more properly subsumed under the rubric of "impracticability."  See, *e.g*., Wright, Miller & Kane, 7A *Federal Practice and Procedure*, § 1762 at 151 (2d ed. 1986); *Anderson v. Dept. of Public Welfare*, 1

---

certified in another case involving Medicare beneficiaries who are also eligible for Medicaid); *Healey v. Shalala*, No. 3:98CV00418 (DJS) (D.Conn., Nov. 19, 1998) (nationwide class certified in challenge to Secretary's failure to require home health agencies to provide procedural rights to beneficiaries, discussed in appeal of merits *sub nom. Lutwin v. Thompson*, 361 F.3d 146, 148 (2d Cir. 2004)); *Fox v. Bowen*, 656 F.Supp. 1236, 1238 n. 2 (D.Conn. 1987) (Connecticut class certified in challenge to Secretary's policies on physical therapy for Medicare beneficiaries).

[3] See *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978); *Lopez v. Orlor, Inc.*, 176 F.R.D. 35, 39 (D.Conn. 1997); *Westman v. Textron, Inc*., 151 F.R.D. 229, 230 (D.Conn. 1993); see also *Doe v. Bridgeport Police Dept.*, 198 F.R.D. 325, 331 (D.Conn. 2001) ("a motion for class certification is not an occasion for examination of the merits of the case").

F.Supp.2d 456, 461 (E.D.Pa. 1998); *National Ass'n of Radiation Survivors v. Walters*, 111

F.R.D. 595, 599 (N.D.Cal. 1986).  Accordingly, the Second Circuit has made clear that its

resolution depends

> on all the circumstances surrounding a case, not on mere numbers.  Relevant
> considerations include judicial economy arising from the avoidance of a multiplicity of
> actions, geographic dispersion of class members, financial resources of class members,
> the ability of claimants to institute individual suits, and requests for prospective
> injunctive relief which would involve future class members.

*Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (citations omitted); see also, *e.g.*, Alba

Conte and Herbert B. Newberg, 1 *Newberg on Class Actions*, § 3:6 at 249-253 (4th ed. 2002).

Furthermore, "[i]mpracticable does not mean impossible."  *Robidoux*, 987 F.2d at 935.

Although there is no magic number, see *Petrolito v. Arrow Financial Services, LLC*, 221

F.R.D. 303, 308-309 (D.Conn. 2004), "numerosity is presumed at a level of  40 members."

*Consol. Rail Corp v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Robidoux*, 987 F.2d at

936; *Doe*, 198 F.R.D. at 331.  In this case, the numbers alone *are* sufficient to resolve the matter,

as the available information indicates that the class has well over the forty members at which a

presumption of impracticability generally adheres.

Extrapolating from available information gives a clear indication that the class is

sufficiently large to preclude joinder as a practical possibility.  The Office of the Inspector

General (OIG) of the Department of Health and Human Services examined SNF claims from

Illinois for calendar year 1996 to determine whether coverage decisions based on the three-day

qualifying hospital stay rule were generally accurate.  DHHS OIG, *Illinois Skilled Nursing

Facility Claims Lacking a Preceding 3-Day Inpatient Hospital Stay*, No. A-05-99-00018 (Sept.

2000).  After concluding that there were 787 claims in which the beneficiary's care had been

covered even though there was some indication that the 3-day qualifying stay requirement had

not been met, the OIG closely examined a statistical sample of 100 of the 787.  It determined that coverage had been improperly granted for 57 of these claims, of which 56 involves beneficiaries who had been in the hospital for at least three days but for whom part of that time had been in the emergency room or on observation status.  *Id*. at 4.[4]  Extrapolating from that analysis indicates that, of the total of 787 claims that appeared to have had coverage mistakenly granted, 440 beneficiaries (56%) would not have been formal inpatients for three days and therefore should not (under the policy here challenged) have been covered.

Thus, in one calendar year in one state, approximately 440 beneficiaries were determined to have had at least one of their three hospital days in observation status or the emergency room – and this factor was the overwhelming reason (56 out of 57, 98%) for incorrect coverage decisions under the policy at issue.

Later studies bear out the Illinois experience.  For instance, in an October 2003 report on SNF payments authorized by the intermediary Medicare Northwest (with the state at issue not identified) for the period 1997 through 2001, the OIG concluded that 87% of 466 covered SNF stays in question did not actually meet the three-day requirement.  DHHS OIG, *Ineligible Medicare Payments to Skilled Nursing Facilities under the Administrative Responsibility of Medicare Northwest*, No. A-05-03-00063 (Oct. 2003), at 3. Although the Report did not specify how many of these coverage errors were caused by including emergency room or observation status days, it did specifically recognize that misunderstanding this aspect of the rule was a common cause of a mistaken coverage determination.  *Id*. at 3-4.  Even if the percentage of mistaken coverage decisions caused by this misapplication of the rule was only 50% (as opposed to the 98% in Illinois), that would still mean that 202 beneficiaries fell into this category of those

---

[4] Copies of the cover pages and relevant portions of this report and of the two other reports discussed *infra* are attached hereto as Exhibits A, B, and C.

with some portion of their three days attributable to emergency room or observation status.[5]

Most recently, in another unnamed state, 75.1% of the 908 covered SNF stays in question over the 1997-2001 period (amounting to 682) were found not to meet the three-day qualifying rule, and, again, the OIG specifically noted that the problem is often attributable to a misunderstanding about the effect of being in the emergency room or on observation status. DHHS OIG, *Ineligible Medicare Payments to Skilled Nursing Facilities under the Administrative Responsibility of Blue Cross and Blue Shield of Nebraska*, No. A-05-04-00061 (Dec. 2004), at 3-4.  Again, if only half of those were caused by the mistaken attribution of time spent in the emergency room or on observation status, that works out to 341 beneficiaries whose coverage was defined by their stay in the emergency room or on observation status.

Moreover, these extrapolations are undoubtedly considerably smaller than the actual numbers affected because they do not include those to whom the Secretary's policy was correctly applied, *i.e.*, those whose coverage was denied because their time in the emergency room or on observation status was not counted.  The actual number of those affected by the rule would therefore be considerably higher.

These numbers indicate that, at any given time, there are hundreds of individuals in just a few states who OIG says should be denied SNF coverage because part of their three-day hospital stay was in the emergency room or on observation status.  OIG has directed fiscal intermediaries to initiate provider education to assure that time in the emergency room or on observation status is not counted as meeting the three-day qualifying stay, so that these past "mistakes" will not be repeated.  This information translates to thousands when extrapolated throughout the country, and, as noted, does not include those for whom the intermediaries have been correctly applying

---

[5]  87% of 466 = 405.42, and 50% of that = 202.71.

the rule and therefore denying coverage.

It is apparent from these OIG reports that the issue of the effect of time in the emergency room or on observation status for purposes of satisfying the qualifying hospital stay requirement arises frequently around the country and is now being focused on by the Secretary to ensure that his policy is correctly applied.  Although it is impossible to know the exact number, this information is sufficient to demonstrate that the class is too large for joinder, which is therefore impracticable.  See *Robidoux*, 987 F.2d at 935 (plaintiffs need not present "evidence of exact class size or identity of class members to satisfy the numerosity requirement").  In any event, though, the "other indicia of impracticability," *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir.), vacated on other grounds, 459 U.S. 810 (1982), leave no doubt that subsection 23(a)(1) is met.

First, it would be extraordinarily inefficient to have numerous lawsuits on this issue, as they all focus on the same point, the Secretary's policy of not counting time in the emergency room or on observation status.  It would "serve judicial economy" and ensure against inconsistent results to allow this case to proceed as a class action.  *Robidoux*, 987 F.2d at 936.  Second, the difficulty for individuals to bring suit or to join in this one is real.  By definition, the class members are elderly and disabled and are physically in poor condition.  Many, probably most, are not financially well off, thus making "individual suits difficult to pursue." *Id.*; see also*, e.g., Jordan*, 669 F.2d at 1319.  Furthermore, they are distributed throughout the country, thus further exacerbating the difficulty of joinder.  See *Robidoux*, 987 F.2d at 936 ("potential class members are distributed over the entire area of Vermont").  These practical impediments inherent in the make-up of the class render it virtually impossible for most class members to file individual cases or otherwise to participate.  Finally, as plaintiffs seek declaratory and injunctive relief for

both present and future members of a class whose make-up is constantly fluctuating, classwide relief is particularly appropriate. *Jordan*, 669 F.2d at 1320; see also, *e.g., Ali v. Ashcroft*, 213 F.R.D. 390, 408-409 (W.D.Wash.), aff'd, 346 F.3d 873 (9th Cir. 2003); *Smith v. Babcock*, 748 F.Supp. 501, 506 (E.D.Mich. 1990) ("many courts have held that when a proposed class is fluid in nature or involves future class members who are presently unidentifiable, joinder is impracticable under Rule 23(a)(1)"), judgment vacated on other grounds, 951 F.2d 350 (6th Cir. 1991) (table).

The available information indicates that, at any given time, probably thousands of Medicare beneficiaries around the country are subject to the challenged policy. Numbers alone are sufficient to satisfy this first component of Rule 23(a)(1), but, in light of the other indicia of impracticability, there can be no doubt that this prong is met.

### 2. Rule 23(a)(2) and (3): Common questions of law and fact exist, and the claims of the named plaintiffs are typical of the claims of the class members.

The next two factors, commonality and typicality,

> tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3). The crux of both requirements is to ensure that maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Marisol A.*, 126 F.3d at 376 (citations and quotation marks omitted); see also *Amchem Products, Inc.*, 521 U.S. at 626 n. 20. "The commonality requirement is met if plaintiffs' grievances share a common question of law or fact." *Marisol A.*, 126 F.3d at 376 (citations omitted). In this case, as in others involving the failure of a government agency to carry out its obligations in the provision of benefits, there can be little doubt that commonality is satisfied. As noted in a Second Circuit decision involving another benefit program, "the questions of law, which

12

predominantly focus on whether the behavior of the defendants violated the [relevant statute and provisions] of the Constitution, are, by necessity, common to the class because they do not depend on the plaintiff-variable but on the defendants, who are a constant." *Comer,* 37 F.3d at 796-797.

Here, there are common questions of *both* law and fact.  The common questions of law are the ultimate issues in the case: whether the defendant's policy of not counting time in the emergency room or on observation status violates the Medicare statute and the guarantee of equal protection provided by the Due Process Clause of the Fifth Amendment.  In the most basic sense, this is "a common issue the resolution of which will advance the litigation." *Petrolito*, 221 F.R.D. at 309 (quotation marks and citation omitted).  The common question of fact, of course, is that all the class members have spent three days in the hospital, with some of that time in the emergency room and/or on observation status.  In short, "[o]ther than the variables which go into the actual composition of the class, ... the lawsuit focuses on the behavior of the defendants and not that of the plaintiffs." *Comer*, 37 F.3d at 797.  In this situation, therefore, commonality is easily met.

The "typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936 (citations omitted); see also, *e.g., Marisol A.*, 126 F.3d at 376; *Petrolito*, 221 F.R.D. at 309-310.  Again, this standard is easily satisfied, as the claims of the named plaintiffs and the class members all arise from the Secretary's policy of denying SNF coverage to Medicare beneficiaries who, while spending three days in a hospital, do not have their time spent in the emergency room or on observation status counted.  Furthermore, the named plaintiffs and the class members are making the same arguments to

13

demonstrate that the Secretary's policy is illegal.

"When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-937 (citations omitted); see also, *e.g., Doe*, 198 F.R.D. at 332.  By proving their claims, the named plaintiffs will necessarily prove the class members' claims as well.  Typicality is therefore met.

### 3.  Rule 23(a)(4): The named plaintiffs will protect the interests of the class.

The adequacy of representation requirement "is motivated by concerns similar to those driving the commonality and typicality requirement, namely, the efficiency and fairness of class certification." *Marisol A.*, 126 F.3d at 378; see also *Amchem Products, Inc.*, 521 U.S. at 626 n. 20 (adequacy of representation requirement tends to merge with the commonality and typicality requirements).  "[A]dequacy of representation is measured by two standards.  First, class counsel must be qualified, experienced and generally able to conduct the litigation.  Second, the class members must not have interests that are antagonistic to one another." *In Re Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 291 (quotation marks and citations omitted); see also, *e.g., Marisol A.*, 126 F.3d at 378.

With respect to the first prong, plaintiffs' counsel have demonstrated their ability to handle this litigation by vigorously representing Medicare beneficiaries, as well as beneficiaries of other Social Security Act programs, for many years.[6]  As Judge Underhill recently observed

---

[6]  A representative sample of reported Medicare decisions on which some or all of plaintiffs' counsel have acted as lead or co-counsel includes *Conn. State Dept. of Social Services v. Thompson* ("*CSDSS*"), 242 F.Supp.2d 127 (D.Conn. 2002), appeal pending, No. 03-6052 (2d Cir.) and 289 F.Supp.2d 198 (D.Conn. 2003), appeal pending, No. 04-0172 (2d Cir.); *Gray*

in a decision awarding attorneys' fees to some of plaintiffs' counsel:

> Having litigated various actions challenging provisions of the Medicare statute
> and regulations, the Center's attorneys had extensive knowledge of the statutory
> and regulatory scheme.  Such knowledge goes far beyond the scope of the general
> legal acumen expected of a competent attorney handling federal litigation.

*CSDSS*, 289 F.Supp.2d at 204-205.  Because of this extensive relevant experience, plaintiffs'

counsel are usually not questioned on the issue of adequacy of representation.[7]

On the second prong, there also can be little doubt.  The named plaintiffs have suffered

from precisely the same policy of discounting time in the emergency room or on observation

status as have the class members.  They seek relief requiring the defendant to take corrective

measures that would benefit the class members as well as the named plaintiffs.  Accord, *Marisol*

*A.*, 126 F.3d at 378.  "[B]ecause there are legal issues common to the class, the plaintiffs ... will

be protecting the interests of the class by advancing their own legal interests in the case ...."

*Doe*, 198 F.R.D. at 333.

There is no antagonism or conflict between the named plaintiffs and the class members,

and the latter's rights will be fully protected and enforced by provision of the relief requested by

the named plaintiffs.

### C.   Plaintiffs meet the requirements of Rule 23(b)(2).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification

---

*Panthers Project Fund v. Thompson*, 273 F.Supp.2d 32 (D.D.C. 2002); *Healey v. Thompson*, 186
F.Supp.2d 105 (D.Conn. 2001), aff'd in part, vacated and remanded in part *sub nom. Lutwin v.
Thompson*, 361 F.3d 146 (2d Cir. 2004); *Grijalva v. Shalala*, 946 F.Supp. 747 (D.Ariz. 1996),
aff'd, 152 F.3d 1115 (9th Cir. 1998), vacated in light of intervening events, 526 U.S. 1096
(1999); *Vorster v. Bowen*, 709 F.Supp. 934 (C.D.Cal. 1989); *Fox v. Bowen*, 656 F.Supp. 1236,
1238 n. 2 (D.Conn. 1987).

[7]  Accordingly, and in order to avoid unnecessary filings, they are not filing declarations
in support of their stated background and experience.  In the event that defendant does challenge
on this point and/or that the Court requests more formal support of this contention, plaintiffs'
counsel will file appropriate declarations.

must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Products, Inc.*, 521 U.S. at 614.  Under (b)(2), "[c]lass certification is appropriate where the defendant has acted or refused to act on grounds generally applicable to the class, thereby making injunctive or declaratory relief appropriate." *Marisol A.*, 126 F.3d at 378.

Again, there can be little doubt that plaintiffs meet this requirement.  This is the paradigm of a Rule 23(b)(2) class action, as "plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to" the class, *Comer*, 37 F.3d at 796, namely, the Secretary's policy of denying SNF coverage when a portion of the three-day hospital stay is attributable to time in the emergency room or on observation status.  Since the "deficiencies ... stem from central and systemic failures" by the Secretary, class certification under Rule 23(b)(2) is the appropriate vehicle for resolving the matter.  *Marisol A.*, 126 F.3d at 378; *see also Yamasaki*, 442 U.S. at 700-701 ((b)(2) class appropriate in challenge to procedures used in Social Security Act case).

## IV.    PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS CLASS COUNSEL.

Newly added Rule 23(g) requires a court to appoint "class counsel" when a class is certified.  F.R.Civ.P. 23(g)(1)(A).  An applicant for class counsel must satisfy subsections (1)(B) and (C) of Rule 23(g) if there is only one applicant, as is the case here.  F.R.Civ.P. 23(g)(2)(B).[8]

---

[8]  The Committee Note is clear that attorneys working together may be appointed as the class counsel:

> In other cases, however, an entire firm, or perhaps numerous attorneys who are not otherwise affiliated but are collaborating on the action will apply.  No rule of thumb exists to determine when such arrangements are appropriate; the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure.

Here, all four attorneys are employees of the Center for Medicare Advocacy and are

Subsection (g)(1)(B) requires that an attorney serving as class counsel "fairly and adequately represent the interests of the class." This tracks the language of Rule 23(a)(4), and plaintiffs have already shown in the context of that provision how their attorneys, based on their histories of experience with Medicare and other Social Security Act programs, will fairly and adequately represent the class.

Subsection (g)(1)(C) directs the Court to consider

- the work counsel has done in identifying or investigating potential claims in the action,
- counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action,
- counsel's knowledge of the applicable law, and
- the resources counsel will commit to representing the class.

F.R.Civ.P. 23(g)(1)(C)(i). The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." F.R.Civ.P. 23(g)(1)(C)(ii). The Committee Note provides assistance for applying these guidelines:

In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case. Unlike the multiple application situation governed by Rule 23(g)(2)(C), the goal in cases in which there is one applicant is to ensure adequate representation for the class. The resources counsel will commit to the case must be appropriate to its needs, but the court should be careful not to limit consideration to lawyers with the greatest resources.

Reviewing the factors, it is clear that plaintiffs' counsel have fully and completely identified the legal issues, as they have raised claims under both the Medicare statute and the equal protection guarantees embodied in the Fifth Amendment's Due Process Clause. Their experience, as reflected in the sample of decisions listed in footnote 6, shows that they have extensive backgrounds in class actions, in the legal and factual issues raised by this case, and in Medicare law. Furthermore, the individual attorneys will have behind them the resources of a

---

collaborating on the litigation. There is no overstaffing here, and all plaintiffs' counsel should be appointed as class counsel.

national organization that for many years has specialized in the rights of the elderly and disabled and advocated aggressively on their behalf.  There can be little doubt that they will meet the goal set out in the Committee Note of "ensur[ing] adequate representation for the class."

Plaintiffs' attorneys' experience, dedication, and knowledge are fully reflected in their lengthy careers on behalf of the elderly and disabled.  Conversely, no reason presents itself as to why they should not be appointed as class counsel.  A fair weighing of the factors set out at Rule 23(g)(1)(C) can lead to only one conclusion, that plaintiffs' counsel should be appointed as class counsel.

## V.      CONCLUSION

As plaintiffs meet all the requirements of Rule 23(a) and subdivision (2) of Rule 23(b), the Court should certify the class.

DATED: January 14, 2005                          Respectfully submitted,


 /s/ Gill Deford
GILL DEFORD
Federal Bar No. ct19269
JUDITH A. STEIN
Federal Bar No. ct08654
BRAD S. PLEBANI
Federal Bar No. ct06865
Center for Medicare Advocacy, Inc.
P.O. Box 350
Willimantic, CT 06226
(860) 456-7790

SALLY HART
Center for Medicare Advocacy, Inc.
100 North Stone Ave., Suite 305
Tucson, AZ 85701
(520) 327-9547